| | | |
|---|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | | Hearing Date: September 9, 2021<br>Hearing Time: 2:00 p.m. |
| ------------------------------------------------------- x<br>:<br>In re                                                     :<br>:<br>**P8H, INC., d/b/a PADDLE 8**,                           :<br>:<br>Debtor.                                      :<br>:<br>------------------------------------------------------- x | | Chapter 11<br><br>Case No. 20-10809 (DSJ) |

**OBJECTION OF UNITED STATES TRUSTEE TO PROPOSED
DISCLOSURE STATEMENT TO ACCOMPANY CHAPTER 11
PLAN OF LIQUIDATION OF THE DEBTOR JOINTLY
PROPOSED BY THE CHAPTER 11 TRUSTEE AND
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

TO:   **THE HONORABLE DAVID S. JONES,
       UNITED STATES BANKRUPTCY JUDGE:**

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"), hereby submits this Objection to the Proposed Disclosure Statement to Accompany Chapter 11 Plan of Liquidation of the Debtor Jointly Proposed By the Chapter 11 Trustee and the Official Committee of Unsecured Creditors, ECF Doc. No. 238 (the "**Disclosure Statement**"). The United States Trustee respectfully states as follows:

**PRELIMINARY STATEMENT**

The United States Trustee objects to the approval of the Disclosure Statement proposed by the Chapter 11 Trustee and the Official Committee of Unsecured Creditors (the "**Committee**") because it fails to provide "adequate information" as required by section 1125 of the Bankruptcy Code. Moreover, the solicitation procedures set forth in the Disclosure Statement and the Plan of Liquidation proposed by Megan E. Noh, Esq., the Chapter 11 Trustee (the "**Chapter 11 Trustee**") and the Committee, ECF Doc. Nos. 237 and 238 (the "**Plan**") do not ensure adequate notice to the affected parties and contemplate the approval of third-party

releases even in the absence of a non-debtor party's affirmative action. Such procedures are improper and should not be approved.[1]

## BACKGROUND

*General Background*

1. P8H Inc., d/b/a Paddle 8 (the "Debtor"), commenced this chapter 11 case by filing a voluntary petition on March 16, 2020. ECF Doc. No. 1.

2. On April 15, 2020, the United States Trustee appointed the Committee. ECF Doc. No. 23.

3. After the Court's issuance of an Order Directing the Appointment of a Chapter 11 Trustee on April 30, 2020, ECF Doc. No. 36, the United States Trustee Appointed the Chapter 11 Trustee on May 8, 2020. ECF Doc. No. 42. The Court approved the appointment by Order entered on May 8, 2020. ECF Doc. No. 43.

4. On August 26, 2021, the Chapter 11 Trustee and the Committee filed the Plan and Disclosure Statement. ECF Doc. Nos. 237, 238. The Plan provides third-party releases for the benefit of certain Released Parties and Released Settling Parties. Plan at Article I, 78, 79; Article XI, 4 (D).[2] The Plan's release provision reads as follows:

> **Releases by Creditors and Others to the Debtor, the Trustee, the Estate, the Committee and the Released Parties**. To the maximum extent permitted by applicable law, as of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Plan Supplement (if any), and the Settlement Agreement, for good and valuable consideration, the adequacy of which is hereby confirmed, including, the service

---

[1] In addition, the Plan impermissibly seeks non-debtor third-party releases that do not comport with Second Circuit law and the Bankruptcy Code. The United States Trustee reserves the right to object to confirmation of the Plan on that and other grounds at a later date. Specifically, the United States Trustee reserves all rights to raise any, and all, statutory, constitutional, and caselaw arguments with respect to confirmation of the Plan.

[2] The third-party releases are also made part of the Settlement Agreement attached to the Plan and made a part thereof. *See* Settlement Agreement, Doc. 237-1, ¶ 11.

of the Released Parties to facilitate the liquidation of the Debtor and the implementation of the Plan and Settlement Agreement, and except as otherwise provided in the Plan, in the Confirmation Order, or the Settlement Agreement, the Released Parties, are deemed forever released and discharged by the (i) holders of all Claims who vote to accept the Plan, (ii) holders of Claims or Interests that are unimpaired under the Plan, (iii) holders of Claims whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan, (iv) subject to the last sentence of this Section XI.4.B that holders of Claims who vote to reject the Plan but do not opt out of granting the releases set forth herein (a "Release Opt-Out"), (v) the Trustee, (vi) the Committee, from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Released and Settled Claims, losses, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor, and any claims for breach of any fiduciary duty (or any similar duty), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Case, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Settlement Agreement, the restructuring of any Claim or Interest before or during the Case, the negotiation, formulation, or preparation of the Disclosure Statement, the Plan and related agreements, instruments, and other documents (including the Plan Supplement (if any)s and the Settlement Agreement), the solicitation of votes with respect to the Plan, any membership in (including, but not limited to, on an *ex officio* basis), participation in, or involvement with the Committee, the structuring, negotiation, performance, or conducting of, participation in, or entry into, the Plan and the Settlement Agreement, including by any member of the Committee, or any other act or omission, including, without limitation, claims arising in, related to or asserted in the FBNK Lien Avoidance Action, the FBNK Breach Actions, the Avoidance Actions or in the Chapter 11 case. For the avoidance of doubt, notwithstanding the foregoing, a Release Opt-Out by a holder of Claims who votes to reject the Plan (i) solely means that such holder is electing to not release the Released Parties other than the Debtor, the Trustee, the Estate and the Committee and (ii) shall not impair, limit or effect in any way the exculpation of the Exculpated Estate Parties as set forth in Section XI.5 of the Plan.

5. Released Parties and Released Settling Parties are defined under the Plan to include non-debtors.[3]  *Id.* at Article I (¶¶ 78, 79).

6. Exculapated Estate Parties are defined under the Plan to include various non-debtors, including many professionals.[4]  *Id.* at Article I (¶ 38).

## OBJECTION

Parties-in-Interest should be given a full and fair opportunity to weigh in on the question of whether they should be bound by third-party releases under a plan. In considering this question, the Court in *In re SunEdison, Inc.*, 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017) ruled that creditors who did not affirmatively vote could not be deemed to consent to the releases in the plan. The Court in *SunEdison* cited to the following language in *In re Chassix Holdings*, 533 B.R. 54, 81 (Bankr. S.D.N.Y. 2015) ("Chassix"):

---

[3] Article I (78) of the Plan defines Released Parties as follows:

**"Released Parties"** means, collectively: the Released Settling Parties, the Debtor, the Trustee, the Committee, the members of the Committee, Ramesh Ganeshan, Michael McClellan, Jana Brooks, and Steven Perez and their respective Professionals and with respect to each of the foregoing entities, such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

**"Released Settling Parties"** means the persons or entities (i) listed on Schedule A attached to the Settlement Agreement, and (ii) the Settlers as defined in the Settlement Agreement.

[4] **"Exculpated Estate Parties"** means each of: (a) the Debtor; (b) the Trustee, solely in her official capacity and not individually; (c) the Committee; (d) the members of the Committee, solely in their capacities as such; (e) the Professionals retained by the Debtor, the Trustee and the Committee; and (f) Rameshkur Ganeshan, Jana Brooks and Steven Perez, each of whom was employed by and/or independently contracted to the Trustee or agents or retained professionals thereof from time to time in connection with the administration of the Estate by the Trustee;, and, with respect to each of the foregoing entities (a) through (f), such entities' current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

Plan, Art. I (¶ 38).

> Charging all inactive creditors with full knowledge of the scope and implications of the Proposed third party *releases*, and implying a "consent" to the third party *releases* based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of "consent" beyond the breaking point.[5]

(Emphasis in original). In other words, silence is not consent where, as here, the releasing parties had no "duty to speak." *SunEdison*, 576 B.R. at 460.[6]

Further, the *SunEdison* Court held that the debtors had failed to sustain their burden of proving that the Court had subject matter jurisdiction to approve the third-party releases without the releasing parties' consent. *In re SunEdison, Inc.*, 576 B.R. at 463. In that case, the non-voting releasors did not consent to the release, the creditors were not being paid in full, and the third-party claims would have been extinguished rather than channeled to a fund for payment. *Id.* Further, the debtors did not identify which third party claims would directly impact their reorganization and given the scope of the release, the Court determined that it is likely that many of the claims would not impact the reorganization. *Id*. Thus, the Court granted the debtors leave to propose a modified form of release under the condition that they must specify the release by name or readily identifiable group and the claims to be released, demonstrate how the outcome of the claims to be released might have a conceivable effect on the debtors' estates and show that this is one of the rare cases involving unique circumstances in which the nonconsensual release

---

[5] One factor in determining whether "consent" to third-party releases exists is the level of sophistication of the releasing parties. In *In re Ditech Holding Corp.*, 606 B.R. 544, 630 (Bankr. S.D.N.Y. 2019), the Court approved the opt out procedures under the plan, noting the absence of evidence "that the holders of the Term Loan Claims lacked the sophistication to understand the consequences of the opt out election. . . ." Here, by contrast, there is no evidence that the releasing parties have same the level of sophistication as the noteholders in *Ditech* so as to enable them to make an informed decision regarding the Plan's provision for third-party releases.

[6] The Court in *SunEdison* rejected the debtors' attempt to distinguish *Chassix* by pointing out that in *SunEdison*, the Plan's proposed distribution to general unsecured creditors was "meaningful." *SunEdison*, 576 B.R. at 461 n.9. The Court questioned whether a small percentage distribution was really "meaningful." *Id.* Here, the proposed distribution to general unsecured creditors is 10%, a percentage that may be insufficient to cause a creditor to take the trouble to vote on the Plan.

of the claims is appropriate under the Second Circuit's standard as set forth in *Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136 (2d Cir. 2005).

The *Chassix* Court also made clear its opposition to requiring creditors to opt out of the releases.[7] The Court required the debtors to revise the definition of "Consenting Creditors" in the plan and did not permit an opt-out procedure for creditors who abstained from voting, voted to reject the plan, or were deemed to accept or reject the plan. *Chassix*, 533 B.R. at 80-82. Accordingly, creditors who reject the Plan or abstain from voting on the Plan but do not opt out of the releases on their ballots should not be deemed to have consented to the third-party releases in the Plan. Moreover, creditors deemed unimpaired under the Plan are not entitled to vote or to opt out of the release provision. The *Chassix* court held that a creditor whose rights are altered by virtue of a third-party release cannot properly be described as "unimpaired" – and "they should not be deemed to have consented to the third party releases set forth in the Plan." *Id.* at 81.

Similarly, interest holders, who are deemed to reject the Plan, have no opportunity to vote, should not be bound by the third-party releases. *Id.* As the court in *Chassix* observed, "it would defy common sense to conclude that those parties had 'consented' to releases." As such parties will not have the opportunity either to opt in or opt out of the releases, these parties

---

[7] The *Chassix* court acknowledged that certain reported decisions in which Courts in this district have approved "opt out" procedures. *Id.* at 77-78, citing *In re DBSD N. Am., Inc.,* 419 B.R. 179, 217–29 (Bankr.S.D.N.Y.2009), *aff'd,* No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010); *aff'd in part, rev' d in part,* 627 F.3d 496 (2d Cir. 2010); *In re Calpine Corp.,* Case No. 05–60200, 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. December 19, 2007). In disagreeing with those decisions, the *Chassix* court noted that if, as the Second Circuit has instructed in *Metromedia*, "if a Bankruptcy Court should be wary of imposing third party releases on creditors," the Court should also be "wary of approving voting procedures that would impose those same releases on creditors" who have not affirmatively consented to them. *Id.* at 78-79.

cannot be deemed bound by them. *Id.*, citing *In re Chemtura Corp.*, 439 B.R. 561, 609-613 (Bankr. S.D.N.Y. 2010).

Accordingly, the Court held that the releases would only apply to (a) any holder of a claim who voted to accept the plan and (b) any holder of a claim who voted to reject the plan but who affirmatively elected to provide the releases by checking the appropriate box on the ballot form – or, in other words, "opted in" the releases. 553 B.R. at 82; *see also In re Emerge Energy Services LP*, 2019 WL 7634308, at 23 (Bankr. D. Del. Dec. 5, 2019) ("[T]he Court cannot on the record before it find that the failure of a creditor or equity holder to return a ballot or Opt-Out Form manifested their intent to provide a release. Carelessness, inattentiveness, or mistake are three reasonable alternative explanations.").

Here, the Plan deems the Released Parties[8] to be released by (i) holders of Claims or Interests that abstain from voting on the Plan *and* who do not affirmatively opt out of the releases, and (ii) holders of Claims or Interests that vote to reject the Plan *and* who do not affirmatively opt out of the releases. *See* Disclosure Statement, ECF Doc. No. 238, pg. 45 of 65.[9] The Released Parties are released by not only creditors who vote to accept the Plan, but also to holders of Claims or Interests that are unimpaired under the Plan, which is to say that creditors and interest holders will have no opportunity to accept or reject the releases. *See id.* at pg. 15 and 45 of 65. The Disclosure Statement and Plan also provide that creditors who receive a ballot

---

[8] The term "Released Parties" includes a long list of individuals, some of whom may not have contributed to the Plan at all, let alone made a "substantial contribution" that would merit a third-party release. As noted in Footnote 1 above, the United States Trustee reserves the right to object to the scope of such releases in the context of confirmation.

[9] The Disclosure Statement does not indicate whether a creditor may abstain from voting but elect to check the "opt out" box regarding the releases. *See* Disclosure Statement, ECF Doc. No. 238, pg. 45 of 65. As is the case with respect to creditors who vote to reject the Plan, consent on the part of the creditors to abstain from voting should be demonstrated through an opt-in procedure.

"but do not vote to accept or reject the Plan" are bound by the release provision. *See id.* at pg. 45 of 65. In other words, they are bound by the releases whether they consent. Finally, under the Plan, even creditors who vote to reject the Plan are bound by the third-party releases unless they also affirmatively opt out. *See id.*

Additionally, the Plan, if confirmed, would provide releases to a wide range of third parties. The Debtors have not met their burden to prove that the Court has subject-matter jurisdiction to impose nonconsensual releases on the persons who qualify as Released Parties from claims of the creditors who do not opt out of the third-party releases. *See In re SunEdison, Inc.*, 576 B.R. at 463. Accordingly, the Disclosure Statement should not be approved unless it is modified so as to afford a meaningful opportunity for the releasing parties to express their consent to the third-party releases.

As the focus of this Objection is on whether voting creditors can be deemed to be consenting to the releases, the Disclosure Statement and Plan should make clear whether notwithstanding the Opt-Out designations, the Plan intends nevertheless to impose non-consensual releases pursuant to *Metromedia*. The Plan should affirmatively make clear whether it intends to honor the Opt-Out designations or whether the Plan will seek to impose non-consensual releases regardless of the Opt-Out designations.

Finally, the breadth of the Plan's release provision may even be exceeded by that of the exculpation provision. Under the Plan,

> a Release Opt-out by a holder of Claims who votes to reject the Plan . . . shall not impair, limit or effect (*sic*) in any way the exculpation of the Exculpated Estate Parties. . . .

Plan, Art. XI, 4, B, ECF Doc. No. 237, pg. 29 of 42. Thus, even those voting creditors who vote to opt out of the third-party release are afforded no opportunity to opt out of the

broad exculpation provision, which covers, among many other individuals, many professionals. *See* Plan, Art. 1 (¶ 38). The Plan – and ballot – should be modified so that voting creditors have a say not only with respect to the releases, but also with respect to the Plan's exculpation provision(s).

      WHEREFORE, the United States Trustee respectfully requests that the Court sustain the Objection and grant such relief as the Court deems fair and just.

Dated: New York, New York
      September 8, 2021

                          Respectfully submitted,

                          WILLIAM K. HARRINGTON
                          UNITED STATES TRUSTEE, Region 2

By:   */s/ Richard C. Morrissey*
       Richard C. Morrissey
       201 Varick Street, Room 1006
       New York, New York 10014
       Tel. (212) 510-0500